Opinión disidente emitida por el
Juez Presidente Señor Hernández Denton.
It is now our generation’s task to carry on what those pioneers began. For our journey is not complete until our wives, our mothers and daughters can earn a living equal to their efforts. Our Journey is not complete until our gay brothers and sisters are treated like anyone else under the law — for if we are truly created equal, then surely the love we commit to one another must be equal as well. (Enfasis suplido).
—Barack Obama(1)
El recurso ante nos representa una oportunidad histó-rica para respetar cabalmente una de las garantías más *964 fundamentales de nuestra Carta Magna: “[Todas las personas] son iguales ante la Ley”. Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 272. Para que sea viable el cumplimiento de este mandato constitucional a través de las generaciones, tenemos que atemperar el or-denamiento jurídico vigente a la realidad extrajurídica de nuestra sociedad. Así honraremos este principio de igual-dad a una pareja del mismo sexo y haremos justicia a una menor que desde su nacimiento ha tenido un hogar estable con sus dos madres.
Como últimos intérpretes de nuestra Ley Suprema, es-tamos obligados a decretar la inconstitucionalidad del Art. 138 del Código Civil, 31 L.P.R.A. sec. 539, por este incluir una clasificación inherentemente sospechosa que discri-mina por razón de sexo.(2) Sin embargo, la opinión mayori-taria aplica con automatismo una ley que discrimina contra una pareja del mismo sexo, cerrando así las puertas a los reclamos legítimos de una madre que quiere legalizar su relación con la niña a quien ha criado desde que nació hace doce años. Por ello, disiento.
No podemos ser insensibles al efecto que la decisión de este Tribunal tiene sobre esta familia. Tampoco podemos ignorar el hecho de que este proceder nos aísla de lo que está ocurriendo en el resto del mundo.(3) Disiento de ese insularismo judicial que parte de la premisa de que nues-tra Constitución hay que interpretarla en el contexto en que fue promulgada hace más de sesenta años, como si *965 fuera un manuscrito antiguo encapsulado en una urna de cristal.
I
Los hechos que originan este recurso están detallados por las ponencias emitidas por las Juezas Asociadas Seño-ras Pabón Charneco y Rodríguez Rodríguez, así como por el Juez Asociado Señor Estrella Martínez, por lo que pres-cindiré de hacer una exposición pormenorizada.
En síntesis, la señora AAR presentó una petición de adopción de la menor JMAV, hija biológica de la señora CW, quien ha sido su pareja por más de veinte años. La menor nació luego de que la pareja se propusiera la mater-nidad como objetivo común y CW se sometiera a un pro-cedimiento de inseminación artificial. AAR solicitó al Tribunal de Primera Instancia que la menor fuera inscrita como su hija en el Registro Demográfico sin que ello con-llevara romper el vínculo jurídico entre la menor y CW. Para ello, propuso que se acogiera la figura de adopción por la segunda madre o el segundo padre funcional (second parent adoption). En la alternativa, atacó la constitucionali-dad del Art. 138 del Código Civil, supra, que prohíbe la adopción por parte de personas del mismo sexo. Invocó la cláusula de la igual protección de las leyes y el derecho a la intimidad. Secs. 1 y 8, Art. II, Const. E.L.A., L.P.R.A., Tomo 1. El foro primario denegó la adopción. El Tribunal de Ape-laciones confirmó. Inconforme, AAR acudió ante nos y ex-pedimos el recurso.
II

La figura de la adopción

La adopción es un acto jurídico solemne mediante el cual se instaura un vínculo jurídico de filiación entre el adoptado y sus adoptantes, estableciendo entre ellos los *966 mismos derechos y obligaciones que emanan de la filiación natural sin limitación alguna. López v. E.L.A., 165 D.P.R. 280, 299 (2005); Zapata et al. v. Zapata et al., 156 D.P.R. 278, 286 (2002); Feliciano Suárez, Ex parte, 117 D.P.R. 402, 406-408 (1986). Esta figura tiene como propósito brindar un hogar adecuado a los niños sin padres y permitir a las personas la oportunidad de tener hijos y establecer una familia. López v. E.L.A., supra, págs. 300; Zapata et al. v. Zapata et al., supra, págs. 286-287. Esto debe lograrse sin que se sacrifique el propósito primordial de esta institu-ción: proteger el mejor bienestar del menor. López v. E.L.A., supra, págs. 300-301; Zapata et al. v. Zapata et al., supra, pág. 287; Virella v. Proc. Esp. Rel. Fam., 154 D.P.R. 742, 754 (2001).
Las normas sustantivas que rigen el proceso de adop-ción están reguladas por nuestro Código Civil. López v. E.L.A., supra, pág. 299. Véase 31 L.P.R.A. secs. 531-539. En lo referente a la controversia que nos ocupa, el Art. 137 de ese cuerpo legal, 31 L.P.R.A. sec. 538, dispone que: “[l]a adopción por decreto final y firme extinguirá todo vínculo jurídico entre el adoptado y su familia biológica o adoptiva anterior”.
No obstante, en Ex parte J.A.A., 104 D.P.R. 551 (1976), establecimos jurisprudencialmente una excepción a la norma impuesta por este artículo. En ese caso, permitimos que una mujer soltera adoptara individualmente a la hija de su exconcubino, sin que este perdiera el vínculo jurídico que tenía con la menor. A esos efectos, pautamos que cuando una persona solicite individualmente adoptar a otra, “el tribunal, en vista de las circunstancias específicas de cada caso, deberá decidir si la ruptura del parentesco biológico del adoptado opera respecto a ambas líneas, la paterna y la materna, o respecto de una sola”. Id., pág. 558. Para fundamentar nuestra conclusión, señalamos que el *967 artículo interpretado(4) no especificaba que la ruptura del vínculo con la familia biológica o adoptiva anterior incluía las dos líneas de parentesco biológico. Por lo tanto, desta-camos que “[n]ada hay en la ley que impida que el adop-tado, al adquirir un padre adoptivo siga vinculado en su parentesco natural con su madre biológica, y viceversa”. Id.
Posteriormente, la Legislatura aprobó la Ley Núm. 8-1995 (31 L.P.R.A. sec. 531 et seq.) para reformar aspectos sustantivos sobre la figura de adopción con el fin de codifi-car lo pautado en Ex parte J.A.A., supra. Para ello, se en-mendó el Art. 138 del referido cuerpo legal, supra, el cual ahora establece, en lo pertinente, que:
No obstante lo dispuesto en la sec. 538 de este título, los vínculos jurídicos del adoptado con su familia paterna o ma-terna anterior subsistirán cuando el adoptado sea hijo del cón-yuge del adoptante, aunque el padre o madre hubiere fallecido a la fecha de presentación de la petición de adopción, o cuando el adoptado proviene de una única filiación y es adoptado por persona de distinto sexo al del padre o madre que lo ha reco-nocido como su hijo. (Enfasis suplido).
Así pues, la norma estatuida en el Art. 137 del Código Civil, supra, tiene solamente las dos excepciones que dis-pone el Art. 138, supra: (1) cuando el adoptante sea cón-yuge del padre o madre legal del adoptado, y (2) cuando el adoptado solo tenga una filiación y el adoptante sea del sexo opuesto al del padre o madre legal del adoptado. Por consiguiente, es evidente que el Art. 138 del Código Civil, supra, no permite que un integrante de una pareja del mismo sexo adopte el hijo de su pareja, sin que esto con-lleve la ruptura del vínculo jurídico entre el adoptado y su padre o madre legal.
*968 Ante esta realidad, la parte peticionaria nos invita a acoger la figura de adopción por la segunda madre o el segundo padre funcional.
Con relación a esta invitación, es meritorio señalar que, durante el proceso de enmiendas a las normas sustantivas de adopción contenidas en el Código Civil, se consideró en la Legislatura el Proyecto del Senado 944 de 16 de noviem-bre de 1994. Este propuso añadir al Código Civil un nuevo Art. 140 que dispusiera, en lo pertinente, que “[e]l tribunal podría decretar la subsistencia del vínculo jurídico del adoptado con su familia anterior atendiendo siempre el bienestar y conveniencia del adoptado”. P. del S. 944 de 16 de noviembre de 1994, 12ma Asamblea Legislativa, 6ta Se-sión Ordinaria, pág. 9.
Este proyecto fue sobreseído por el Proyecto de la Cá-mara 1607, que luego se convirtió en la Ley Núm. 8, supra. Como hemos visto, la enmienda introducida finalmente al Art. 138 del Código Civil, supra, no concedió al Tribunal la facultad para decretar la subsistencia del vínculo jurídico del adoptado con su familia anterior si eso responde a su mejor interés y bienestar. Véase Historial Legislativo de la Ley Núm. 8, supra, Art. 140 del P. del S. 944, supra, pág. 10.
Por otra parte, en este caso no podemos seguir el mismo curso de acción que seguimos en Ex parte J.A.A., supra. En aquella ocasión enfatizamos que la ley no prohibía expre-samente que el adoptado, al adquirir un padre adoptivo, siguiera vinculado jurídicamente con su madre biológica, y viceversa. Ahora nos encontramos con una situación dife-rente, pues los Arts. 137 y 138 del Código Civil, supra, impiden expresamente que los vínculos jurídicos del adop-tado con su familia paterna o materna anterior subsistan cuando el adoptado proviene de una única filiación y el adoptante es del mismo sexo que el del padre o madre legal. Consecuentemente, ante esta prohibición expresa por parte del legislador, estamos impedidos de acoger la *969 figura de second parent adoption como nos solicita la parte peticionaria.
En la alternativa, el recurso que hoy nos ocupa impugna la constitucionalidad del Art. 138, supra, por discriminar por razón de sexo. Veamos.
III
A. Igual protección de las leyes
La Constitución del Estado Libre Asociado de Puerto Rico dispone lo siguiente en la Sec. 1 del Art. II:
La dignidad del ser humano es inviolable. [Todas las personas] son iguales ante la Ley. No podrá establecerse dis-crimen alguno por motivo de raza, color, sexo, nacimiento, ori-gen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana. Art. II, Sec. 1, Const. E.L.A., supra, pág. 272.
Cuando se cuestione la constitucionalidad de una ley, invocando la cláusula de igual protección de las leyes, los tribunales deberán determinar en primer lugar si la clasi-ficación impugnada afecta un derecho fundamental o esta-blece una clasificación sospechosa. López v. E.L.A., supra, pág. 299. En lo pertinente a este recurso, hemos estable-cido que son clasificaciones inherentemente sospechosas aquellas establecidas por motivo de raza, color, sexo, naci-miento, origen o condición social, ideas políticas o religio-sas y nacionalidad. Wackenhut Corp. v. Rodríguez Aponte, 100 D.P.R. 518, 531 (1992); Pérez, Román v. Proc. Esp. Rel. de Fam., 148 D.P.R. 201, 212-213 (1999).
Si la legislación contiene una de las clasificaciones enu-meradas, el tribunal deberá aplicar el escrutinio estricto. Wackenhut Corp. v. Rodríguez Aponte, supra; Pérez, Ro-mán v. Proc. Esp. Rel. de Fam., supra. Según este escruti-nio, la ley se presumirá inconstitucional y recaerá sobre el Estado la carga de probar que el trato desigual persigue un *970 interés apremiante, que el discrimen es necesario para conseguir ese interés y que no existen medios menos one-rosos para ello. Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715, 733 (1980); Zachry International v. Tribunal Superior, 104 D.P.R. 267, 282 (1975).
Por otra parte, si la clasificación impugnada no incide sobre un derecho fundamental ni establece una clasifica-ción sospechosa, se evaluará su constitucionalidad utili-zando el escrutinio de racionalidad mínima o escrutinio tradicional. Zachry International v. Tribunal Superior, supra. Al aplicarlo, la clasificación se presumirá constitu-cional y será válida siempre que se determine que persigue un interés estatal legítimo que tiene un nexo racional con la clasificación. López v. E.L.A., supra, pág. 298; Berberena v. Echegoyen, 128 D.P.R. 864, 879 (1991). Para lograr que sea declarada inconstitucional, la parte que la cuestiona tendrá que demostrar que la clasificación es arbitraria o irracional. Id.
Por su parte, el Tribunal Supremo federal ha reconocido y utilizado el escrutinio intermedio cuando la clasificación legislativa afecta “ ‘intereses individuales importantes, aunque no sean necesariamente fundamentales, y el uso de criterios sensitivos de clasificación, aunque no sean ne-cesariamente sospechosos’ ”. Defendini Collazo et al. v. E.L.A., Cotto, 134 D.P.R. 28, 61 (1993); citando a León Rosario v. Torres, 109 D.P.R. 804, 814 (1980). Es decir, este análisis se aplica en situaciones que involucran intereses individuales importantes que podrían afectar derechos fundamentales y que no han sido contemplados expresa-mente en la Constitución federal. Berberena v. Echegoyen, supra, esc. 2. Ese escrutinio solo requiere que la clasifica-ción adelante un interés gubernamental legítimo o impor-tante y que esté sustancialmente relacionada con ese interés. Defendini Collazo et al. v. E.L.A., Cotto, supra; Berberena v. Echegoyen, supra. En particular, el Tribunal Supremo estadounidense ha aplicado este tipo de escruti- *971 nio en casos relacionados con clasificaciones fundadas en sexo, nacimiento y extranjería. Id. Véanse, además: Mills v. Hábluetzel, 456 U.S. 91 (1982); Orr v. Orr, 440 U.S. 268 (1979); Hampton v. MowSun Wong, 426 U.S. 88 (1976).
Una de las más claras diferencias entre el derecho cons-titucional puertorriqueño y el federal es que Puerto Rico no ha adoptado el escrutinio intermedio. J.J. Alvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos: casos y materia-les, Bogotá, Ed. Temis, 2009, pág. 816. Véanse, además: Defendini Collazo et al. v. E.L.A., Cotto, supra; Almodovar v. Méndez Román, 125 D.P.R. 218, 254 (1990). Esto se debe a que las clasificaciones que han requerido un escrutinio intermedio en Estados Unidos, por no estar incluidas en la Constitución federal, sí están prohibidas expresamente por nuestra Constitución. Berherena v. Echegoyen, supra. Por tal razón, hemos resuelto consistentemente que, en nues-tra jurisdicción, la constitucionalidad de esas clasificacio-nes será evaluada mediante el escrutinio estricto. Alvarez González, op. cit. Véanse, además: Com. de la Mujer v. Srio. de Justicia, supra; Zachry International v. Tribunal Superior, supra; Ocasio v. Díaz, 88 D.P.R. 676 (1963).
La parte peticionaria alega que el Art. 138, supra, viola la igual protección de las leyes por contener una clasifica-ción discriminatoria por razón de sexo, género y orienta-ción sexual. Antes de evaluar su planteamiento, revisemos las normas de interpretación aplicables a nuestra Constitución.
B. Interpretación constitucional
Nuestra Constitución está redactada en términos am-plios que establecen principios generales sobre asuntos fundamentales de la vida colectiva. Acevedo Vilá v. Aponte Hernández, 168 D.P.R. 443, 462 (2006); Nogueras v. Hernández Colón, 127 D.P.R. 405, 412 (1990). Al momento de interpretarla, debemos dar fuerza y vitalidad a esos prin-cipios con el fin de garantizar su relevancia y vigorosidad *972 para los problemas de nuestro tiempo. P.I.P. v. C.E.E., 120 D.P.R. 580, 613 (1988); López Vives v. Policía de P.R., 118 D.P.R. 219, 227 (1987).
Por ello, hemos sido conscientes de que “[c]omo intérpre-tes máximos de este documento no podemos limitar su al-cance ni congelar sus principios a la época en que se pro-mulgaron... Hay que evitar pronunciamientos que la fosilicen y la conviertan en una pieza de museo de historia”. P.I.P v. C.E.E., supra, pág. 613. Es decir, no po-demos permitir que nuestra Constitución se torne obsoleta gracias a interpretaciones literales, restrictivas e inflexibles que impidan su aplicabilidad a eventualidades futuras y que lleven a resultados contrarios a los valores fundamen-tales que consagra. Acevedo Vilá v. Aponte Hernández, supra; Nogueras v. Hernández Colón, supra; P.I.P. v. C.E.E., supra, págs. 613-614.
Este método de interpretación constitucional se asemeja a una de las dos teorías principales desarrolladas en Esta-dos Unidos para interpretar la Constitución federal. Este sostiene que ese documento evoluciona a la luz de las cir-cunstancias existentes en el momento de decidir una con-troversia constitucional. R. Dworkin, Taking Rights Seriously, Cambridge, Harvard U. Press, 1977, pág. 132-137. Véase, además, L. Tribe y M. Dorff, Levels Of Generality In The Definition Of Rights, 57 (Núm. 4) U. Chi. L. Rev. 1057, 1067-1087 (1990).
El profesor David A. Strauss destaca que las decisiones del Tribunal Supremo estadounidense sobre la segregación en las escuelas, el discrimen por razón de sexo, el principio de “una persona, un voto” y otros temas han sido posibles gracias a este método de interpretación.(5) D.A. Strauss, Do *973 We Have a Living Constitution?, 59 Drake L. Rev. 973, 976 (2011). Sobre esto, el Juez Asociado del Tribunal Supremo de Estados Unidos Hon. Stephen G. Breyer sostiene que estas decisiones adelantaron los objetivos básicos de la Constitución “[by giving] life to the Constitution’s liberty-protecting promises, that helped to make ‘We the People’ a phrase that finally includes those whom the Constitution originally and intentionally ignored”. S.G. Breyer, Active Liberty: Interpreting our Democratic Constitution, Nueva York, Vintage Books, 2005, pág. 20.
Por otra parte, la corriente principal del “originalismo” postula que la Constitución federal debe interpretarse de la misma forma que lo hicieron quienes aprobaron y ratifi-caron su texto. J. Green, Selling Originalism, 96 Geo. L.J. 657, 658 (2009). Es menester señalar que la erradicación del discrimen racial y del discrimen contra la mujer, así como el reconocimiento del derecho a la intimidad en Esta-dos Unidos,(6) no hubieran sido posibles de haberse apli-cado inflexiblemente la teoría “originalistá” en todos los ca-sos constitucionales citados. Afortunadamente, en nuestra jurisdicción, no tenemos que escoger entre estas teorías de interpretación constitucional. Es preciso diferenciar que estas se desarrollaron en Estados Unidos porque la Cons-titución federal no contiene instrucciones sobre su interpretación. M. Schor, Contextualizing the Debate between Originalism and the Living Constitution, 59 Drake L. Rev. 961, 963 (2011) (“one of the curious aspects of our Constitution — as well as constitutions around the globe — is that it does not contain language informing fu *974 ture generations how it should be interpreted”). En con-traste, nuestra Carta de Derechos, aprobada más de dos siglos después, sí contiene una cláusula que nos indica cómo debemos interpretar su texto.
La Sec. 19 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, ed. 2008, pág. 379, establece, en lo pertinente, que “[l]a enumeración de derechos que antecede no se enten-derá en forma restrictiva ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia, y no mencionados específicamente”. (Enfasis suplido).(7) Du-rante la Convención Constituyente, el delegado Jaime Be-nitez expresó que el objetivo de esta sección es
... proteger los derechos del individuo contra una interpreta-ción restrictiva o contra una interpretación basada en la cono-cida norma de inclusio unius, exclusio alterius... Una interpre-tación en el sentido de que todo lo que no se desprenda literalmente de cada una de las palabras usadas está por lo tanto excluido de la protección constitucional, sería contraria a la actitud básica que ha regido a la Comisión al preferir el lenguaje breve de los grandes principios en vez de la formula-ción minuciosa de los detalles inagotables. (Enfasis suplido). 4 Diario de Sesiones de la Convención Constituyente 2576 (1951).
De esta forma, nuestra Carta de Derechos garantiza la “protección más liberal de los derechos del individuo”. Id. Es este el criterio rector que debemos seguir al analizar si la prohibición constitucional del discrimen por razón de sexo incluye y prohíbe las prácticas discriminatorias por razón de orientación sexual. Asimismo, debemos tener pre- *975 sente el mandato impuesto por los constituyentes, quienes dejaron claro en el historial legislativo de nuestra Carta de Derechos que
[l]a igualdad ante la ley queda por encima de accidentes o diferencias, bien tengan su origen en la naturaleza o en la cultura. Todo discrimen o privilegio contrario a esta esencial igualdad repugna el sistema jurídico puertorriqueño. En cuanto fuera menester nuestra organización legal queda ro-bustecida por la presente disposición constitucional, a la vez que obligada a ensanchar sus disposiciones para dar plena realización a lo aquí dispuesto. (Enfasis suplido). Diario de Sesiones, supra, pág. 2561.
En lo que respecta al señalamiento del compañero Juez Asociado Señor Martínez Torres con relación a los princi-pios de interpretación constitucional y mi posición en Andino Torres, Ex parte, 151 D.P.R. 794 (2000), y en Delgado, Ex parte, 165 D.P.R. 170 (2005), entiendo que ambos casos son irrelevantes a la controversia ante nuestra consideración. No obstante, no tengo problemas con afir-mar que, de llegar a este Tribunal un caso similar a An-dino Torres, Ex parte, supra, haría lo mismo que hice en aquella ocasión. Con el paso de los años, soy más sensible a los perjuicios que sufren las personas que son discrimina-das por razón de género. En la vida, todos los seres huma-nos vamos evolucionando y reflexionando sobre las decisio-nes que tomamos en el pasado. Los efectos adversos que históricamente han tenido decisiones judiciales retrógra-das me han convencido de que el camino correcto hacia la igualdad es el que hoy expongo en este disenso. El dilema no es tan sencillo como algunos exponen ni tampoco es cuestión de acoger posturas que algunos critican por su-puestamente ser “anti-intelectuales” y “radicales”. Se trata de tener sensibilidad ante los problemas reales que enfren-tan las personas y de cumplir con nuestra obligación cons-titucional de defender y proteger la dignidad y la igualdad *976 del ser humano consagrada en nuestra Constitución.(8) Véase Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1. Además, como admite el compañero Juez Asociado Señor Mar-tínez Torres, en este caso se trata de que nuestro compro-miso con el bienestar de los menores requiere reconocer a las parejas del mismo sexo y las parejas heterosexuales en igualdad de condiciones. Opinión de conformidad del Juez Asociado Señor Martínez Torres, pág. 910. Recordemos las palabras del constitucionalista Efrén Rivera Ramos:
Para poder atender, entonces, de forma multidimensional, el problema que las diferencias reales de las personas les plan-tean a los sistemas normativos habrá que recurrir a acciones y decisiones de diverso tipo. Unas veces se requerirá eliminar barreras legales, otras, obstáculos de otra índole. Podría ser necesario proveer los recursos, la protección o los servicios ne-cesarios para que la igualdad se convierta en un disfrute real y no siga siendo una mera promesa del sistema formal. En ocasiones se requerirá la intervención activa para nivelar re-laciones asimétricas y opresivas de poder. Esto último es par-ticularmente crucial en el contexto de las relaciones basadas en referentes como la raza, el sexo, la orientación sexual y la clase social. E. Rivera Ramos, La igualdad: una visión plural, 69 Rev. Jur. U.P.R. 1, 25 (2000).
Expuesto lo anterior, veamos si la prohibición constitu-cional contra el discrimen por razón de sexo también pro-híbe el discriminar por orientación sexual.
C. Discrimen por razón de sexo
Toda clasificación o discrimen por motivo de sexo es una *977 clasificación inherentemente sospechosa. Com. de la Mujer v. Srio. de Justicia, supra, pág. 733; Zachry International v. Tribunal Superior, supra. Al interpretar la cláusula constitucional que prohíbe este tipo de discrimen, hemos aseverado que
[a]l condenar el discrimen por motivo de raza, color, sexo, nacimiento, origen social, ideas políticas o religiosas, nuestra Constitución reconoce un sistema jurídico humanitario que postula la dignidad del ser humano, su inviolabilidad e igual-dad ante la ley. Con ello se intentan superar y sobrepasar los accidentes circunstanciales que tengan origen en la naturaleza o en la cultura. Es evidente que el sexo, al igual que la raza, constituyen rasgos que surgen en el ser humano por un simple hecho fortuito: el nacimiento; éste nada tiene que ver con la habilidad de la persona de oportunamente aportar y contri-buir a los esfuerzos legítimos de una sociedad. Es por ello que nos reafirmamos en que ante este foro judicial, una diferencia basada en el sexo resulta una clasificación sospechosa, en particular cuando la misma tiende a relegar a un estado legal de inferioridad a una clase con abstracción de las potencialidades y características individuales de sus miembros. Zachry International v. Tribunal Superior, supra, págs. 281-282.
Posteriormente, en Com. de la Mujer v. Srio. de Justicia, supra, evaluamos la constitucionalidad de una clasifi-cación basada en sexo y señalamos que “[e]s evidente que la legislatura ha actuado a base de meras conjeturas, pre-juicios arcaicos y nociones estereotipadas, con abstracción de las características verdaderas de los miembros del gé-nero femenino” al establecer este tipo de clasificación.
Luego, en Milán Rodríguez v. Muñoz, 110 D.P.R. 610, 615 (1981), analizamos nuevamente la prohibición consti-tucional contra el discrimen por razón de sexo y señalamos que esta va dirigida a erradicar “premisas subjetivas, erró-neas, tradicionales y estereotipadas que emanan de una visión masculina que consciente o inconscientemente tiene su razón de ser en la caracterización de la mujer como sexo débil”.
De los textos citados, podemos apreciar que la interpre-tación que se le ha dado a la prohibición constitucional *978 contra el discrimen por razón de sexo se fundamenta, más bien, en los roles de género y no en la mera diferencia fisiológica entre hombre y mujer.
Precisamente, la profesora Katherine M. Franke explica en su artículo The Central Mistake of Sex Discrimination Law: The Disaggregation of Sex from Gender, 144(Núm. 1) U. Pa.L. Rev. 1, 1-4 (1995), que el sexo y el género no son dos aspectos distintos y separados de la identidad humana, por lo que es errónea la visión de que el sexo se refiere al producto biológico de la naturaleza, independiente del gé-nero, que se refiere al producto de la cultura. Por lo tanto, señala que la legislación y la jurisprudencia federal que intentan diferenciar ambos conceptos incurren en un gran error. Id. En específico, critica lo siguiente:
Antidiscrimination law is founded upon the idea that sex, conceived as biological difference, is prior to, less normative than, and more real than gender. Yet in every way that matters, sex bears an epiphenomenal relationship to gender; that is, under close examination, almost every claim with regard to sexual identity or sex discrimination can be shown to be grounded in normative gender rules and roles... By accepting these biological differences, equality jurisprudence reifies as foundational fact that which is really -an effect of normative gender ideology...
The targets of antidiscrimination law, therefore, should not be limited to the “gross, stereotyped distinctions between the sexes” but should also include the social processes that construct and make coherent the categories male and female, id., pág. 2.
Al igual que la profesora Franke, múltiples juristas han analizado la equivalencia entre estos términos en el con-texto de la prohibición de prácticas discriminatorias. Como veremos a continuación, hay tres tendencias interpretati-vas: (1) que discriminar por razón de orientación sexual constituye discrimen por razón de sexo, (2) que discriminar por razón de orientación sexual constituye discrimen por razón de género y (3) que discriminar por razón de orien- *979 tación sexual y discriminar por razón de sexo son real-mente discrimen por razón de género. Todos los juristas coinciden en que debería reconocerse que discriminar por razón de orientación sexual está prohibido, ya sea por constituir discrimen por razón de sexo o discrimen por ra-zón de género. Veamos varios ejemplos.
Primero, el profesor Andrew Koppelman ha argüido fir-memente que el discrimen por razón de orientación sexual es una modalidad de discrimen por razón de sexo. A. Kop-pelman, Defending the Sex Discrimination Argument for Lesbian and Gay Rights: A Reply to Edward Stein, 49 U.C.L.A. L. Rev. 519 (2001). Uno de sus argumentos con-siste en que el discrimen contra gays y lesbianas refuerza la jerarquía del hombre sobre la mujer, lo cual oprime a esta última. A. Koppelman, Why Discrimination Against Lesbians and Gay Men is Sex Discrimination, 69 N.Y.U. L. Rev. 197, 199, 202 (1994).
Asimismo, el profesor Koppelman distingue que si una conducta está prohibida o estigmatizada cuando es reali-zada por una persona de un sexo, pero es tolerada cuando la comete una persona del otro sexo, entonces la autoridad que impone la prohibición y estigma está discriminando por razón de sexo. Koppelman, Why Discrimination Against Lesbians and Gay Men is Sex Discrimination, op. cit, pág. 208. A raíz de esto, el profesor Koppelman concluye que:
[l]aws that discriminate against gays rest upon a normative stereotype: the bald conviction that certain behavior —for example, sex with women— is appropriate for members of one sex, but not for members of the other sex. Such laws therefore flatly violate the constitutional prohibition on sex discrimination as it has been interpreted by the Supreme Court. Since intermediate scrutiny of gender-based classifications is appropriate, and laws that discriminate against gays cannot withstand intermediate scrutiny, our legal argument is concluded. A court applying received doctrine should invalidate any statute that singles out gays for unequal treatment. Id., pág. 219.
*980 Segundo, la profesora Sylvia A. Law arguye que las le-yes que discriminan contra gays y lesbianas violan los principios constitucionales de equidad de género, por lo que deben ser invalidadas. S.A. Law, Homosexuality and the Social Meaning of Gender, 1988 Wis. L. Rev. 187. En particular, sostiene que: “[h]istory suggests that a primary purpose and effect of state enforcement of heterosexuality is to preserve gender differentiation and the relationships premised upon it. Thus, constitutional restraints against gender discrimination must also be applied to laws censuring horn[o]sexuality”. Id., pág. 230. Además, con especial pertinencia al caso que nos ocupa, la profesora Law señala que: “[g]ay people are barred from raising children not because of a natural disability, but rather, like so much of sex discrimination, because of social construction”. Id., pág. 231.
Tercero, la Leda. Amelia Craig(9) argumenta que el dis-crimen por razón de orientación sexual y el discrimen por razón de sexo son realmente discrimen por razón de género. A. Craig, Musing About Discrimination Based On Sex And Sexual Orientation As “Gender Role” Discrimination, 5 S. Cal. Rev. L. & Women’s Stud. 105 (1995). Destaca que “[s]exual orientation discrimination is a form of gender discrimination. It is founded in the same fundamental presumption-that traditional gender roles should be enforced-that serves as the premise for sex discrimination”. Id., pág. 106. Otros juristas que analizan el discrimen por orienta-ción sexual desde una perspectiva de roles de género son los profesores Francisco Valdés, Marc Fajer, Mary Becker, Marilyn Frye, Mary Coombs y Judith Butler, así como la Sra. Suzanne Pharr. C.A. MacKinnon, Sex Equality, 2da ed., Nueva York, Foundation Press, 2007, págs. 1045-1069.
El debate sobre cuál es el concepto correcto para el dis-crimen que hoy analizamos no ha estado ausente en nues- *981 tra jurisdicción. En 1995, la Comisión Judicial Especial para investigar el Discrimen por Género en los Tribunales de Puerto Rico emitió un informe en el que se distinguió terminológicamente entre los conceptos “género” y “sexo”. Informe sobre el discrimen por razón de género en los tribunales de Puerto Rico, Comisión Judicial Especial para investigar el Discrimen por Género en los Tribunales de Puerto Rico, 22 de agosto de 1995 (Informe). Este expuso que “sexo” se refiere solamente “a las características bioló-gicas que se han utilizado para distinguir entre los hombres y las mujeres”. Id., pág. 18. Por otro lado, definió “gé-nero” como “la construcción histórico-social que se ha hecho de las características que se consideran definitorias de los hombres y de las mujeres y de los comportamientos espe-rados de los unos y de las otras en nuestra sociedad”. Id. Definidos ambos conceptos, la Comisión prefirió usar el concepto género “por entender que tiene una fuerza expli-cativa mayor que el término sexo para referirse a las cir-cunstancias y problemas relacionados con las diferencias de trato hacia hombres y mujeres”. íd., pág. 19. Cabe seña-lar que el profesor José J. Alvarez González sigue la dis-tinción hecha por la Comisión y prefirió el concepto discri-men por razón de “género” sobre el de discrimen por razón de “sexo” en su libro Derecho constitucional de Puerto Rico y relaciones constitucionales con Estados Unidos: casos y materiales. Alvarez González, op. cit, págs. 851-881.
En su informe, la Comisión concluyó que discriminar por orientación sexual constituye discrimen por razón de género.(10) Íd., pág. 24. En específico, el informe explica que:
[e]n estos casos se dispensa un trato discriminatorio contra una persona por razón de que ha optado por comportamientos, *982 incluyendo los relativos a la sexualidad, que se diferencian de aquéllos que se han asignado tradicionalmente a los hombres y a las mujeres en virtud de su sexo. Esta asignación de com-portamientos esperados incluye normas estandarizadas sobre la sexualidad, estilos de vida, modos de relacionarse las per-sonas con otras de su propio y del otro sexo, normas de vesti-menta, manejo del cuerpo y otros tantos aspectos de la con-ducta humana evaluadas con referencia al sexo de la persona. En otras palabras, en estos casos el trato discriminatorio, ba-sado en estereotipos, recae sobre aquellas personas que han cuestionado la construcción social del género que caracteriza las sociedades en las que sólo las relaciones heterosexuales se consideran normales.
De hecho, las atribuciones sociales de género que dictan pautas y fuerzan a las personas a actuar de ciertas maneras y a excluir otras, y que conforman las expectativas de cómo de-bemos interactuar las mujeres y los hombres, establecen pa-rámetros más rígidos y punitivos si se transgreden cuando se trata de personas homosexuales y lesbianas. La homosexuali-dad y el lesbianismo contradicen las características aceptadas por las visiones prevalecientes sobre lo que es ser mujer y lo que es ser hombre y sobre la complementariedad de los sexos. Los comportamientos homosexuales y lésbicos retan el orden dominante en muchos sentidos, entre otras cosas por lo que esos comportamientos simbolizan para el orden vigente de subordinación de las mujeres y por ende para los privilegios y ventajas que este orden confiere a la mayoría de los hombres, íd., págs. 24-25.
Finalmente, la Comisión asevera que “[e]l Derecho debe revaluar los esquemas que no se ajustan a las nuevas rea-lidades sociales, mucho más, si el efecto de la inacción es perpetuar el discrimen, la intolerancia y el prejuicio de unas personas frente a otras”. Informe, pág. 185.
De esta discusión, podemos apreciar que hay consenso en cuanto a que discriminar por orientación sexual está prohibido, ya sea por constituir discrimen por razón de “sexo” o discrimen por razón de “género”. Asimismo, vemos que la prohibición constitucional contra el discrimen por razón de sexo se ha fundamentado, no en las diferencias fisiológicas entre hombre y mujer, sino, más bien en los roles y estereotipos de género asignados socialmente a los hombres y las mujeres.
*983 Expuesto lo anterior, es razonable preguntarnos por qué los Constituyentes no utilizaron la palabra “género” en lu-gar de la palabra “sexo” en su enumeración de discrímenes prohibidos constitucionalmente. La respuesta es sencilla. Cuando se aprobó nuestra Constitución en 1952, no se ha-bía desarrollado el concepto género como categoría preferential o como alternativa al concepto sexo. El término “gé-nero” fue acuñado en 1955 por el profesor John Money, en una serie de ensayos sobre intersexualidad, para referirse a las cualidades psicológicas, sociales y de comportamiento atribuidas por la sociedad al sexo. J. Todd Weiss, Transgender Identity, Textualism, and the Supreme Court: What Is the “Plain Meaning” of “Sex” in Title VII of the Civil Rights Act of 1964?, 18 Temp. Pol. & Civ. Rts. L. Rev. 573, 603-610 (2009), citando a J. Money, Hermaphroditism, Gender and Precocity in Hyperadrenocorticism: Psychologic Findings, 96 Bull. Johns Hopkins Hosp. 253, 254 (1955). Antes del desarrollo de ese concepto, la palabra “sexo” abarcaba el universo de características físicas, psicológicas y sociales, así como el comportamiento del individuo. Todd Weis, op. cit., pág. 610. Véase, además, J. Meyerowitz, How Sex Changed: A History of Transsexuality in the United States, Cambridge, Harvard U. Press, 2002, pág. 114. Así las co-sas, es evidente que la palabra “sexo”, según utilizada en nuestra Carta de Derechos, incluye lo que posteriormente fue recogido en la palabra “género”, además del significado fisiológico al cual posteriormente se limitó la palabra “sexo”. La orientación sexual forma parte de las caracterís-ticas que se engloban en el concepto “género”, por lo que este discrimen también está proscrito por la Constitución.
Por cierto, en el contexto internacional, el Comité de Derechos Humanos de la Organización de las Naciones Unidas (ONU), que tiene a su cargo la implantación del Pacto Internacional de Derechos Civiles y Políticos de 1966, determinó que la prohibición del discrimen por razón de sexo contenida en el Art. 2 y en el Art. 26 del Pacto debe *984 interpretarse como que incluye la prohibición del discri-men por orientación sexual. E. Vicente, La reforma de las Naciones Unidas y los derechos sexuales: ¿hacia una cuarta generación de derechos humanos?, 43 Rev. Jur. U.I.P.R. 39, 65 (2008), citando a Toonen v. Australia, Comunicación No. 488/1992, UN Doc CCPR/C/50/D/488/1992 (1994). Estados Unidos firmó y ratificó este Pacto. Véase U.N. Treaty Collection, Status of Treaties, Chapter IV: Human Rights, http ://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mt dsg_no=IV-4& chapter=4&lang=en (última visita el 14 de febrero de 2013).
Por todo lo anterior, es lógico reconocer y concluir que la prohibición constitucional contra el discrimen por razón de sexo proscribe también discriminar por razón de orienta-ción sexual. Consiguientemente, según la doctrina de igual protección de las leyes, procede aplicar el escrutinio es-tricto cuando se rete la constitucionalidad de una ley por-que esta discrimina por razón de orientación sexual.
IV
Con respecto al caso que tenemos ante nuestra conside-ración, sostuve anteriormente que el Art. 138 del Código Civil, supra, permite, a modo de excepción, la subsistencia de los vínculos jurídicos del adoptado con su familia pa-terna o materna anterior “cuando el adoptado proviene de una única filiación y es adoptado por persona de distinto sexo al del padre o madre que lo ha reconocido como su hijo”. De su faz se desprende que el artículo contiene una clasificación por razón de sexo. Además, vimos que en su aplicación este permite que los vínculos jurídicos de un me-nor, que ostente una única filiación, subsistan únicamente cuando este sea adoptado por una persona de sexo distinto al de su padre o madre legal. Es decir, permite que una pareja del sexo opuesto al del padre o madre legal adopte al hijo de este último, mientras que lo prohíbe a una pareja *985 del mismo sexo al del padre o madre legal. Siendo así, el Art. 138, supra, es discriminatorio por razón de sexo.(11) Este artículo establece una clasificación inherentemente sospechosa que debe ser evaluada al crisol del escrutinio estricto.
Consiguientemente, esta disposición legal se presume inconstitucional y recae sobre el Estado la carga de probar que el trato desigual persigue un interés apremiante, que el discrimen es necesario para conseguir ese interés y que no existen medios menos onerosos para ello. Véanse Com. de la Mujer v. Srio. de Justicia, supra, pág. 733; Zachry International v. Tribunal Superior, supra, pág. 282.
La Asamblea Legislativa no expuso en el historial legis-lativo del Art. 138, supra, justificación alguna para impo-ner la ruptura del vínculo jurídico del adoptado con su padre o madre legal cuando el adoptante es de su mismo sexo. Solo contamos con lo alegado por el Estado en su comparecencia:
... Lo que el Artículo 138 del Código Civil no permite, es que los menores que se pretenden adoptar tengan “dos mamás” o “dos papás” legalmente reconocidos. Es obvio que dicho articu-lado busca proteger los valores arraigados en la institución de la familia como pilar fundamental de nuestra sociedad e im-pregnarle la más alta jerarquía al interés que promueve el bienestar del menor. Así pues, el Estado sólo puede encausar racionalmente estos legítimos intereses mediante la clasifica-ción establecida...
Si examinamos íntegramente la norma impugnada con el resto de las disposiciones vigentes en materia de Familia, nos podemos dar cuenta de que ésta parte de la premisa de que la familia tradicional se compone de una madre y un padre cons-tituidos en el concepto de matrimonio que reconoce el Artículo 68 del Código Civil de Puerto Rico. De modo que, acceder a la petición de adopción solicitada por AAR, representaría una *986 transformación radical de nuestro Derecho en esta área, de-bido a las implicaciones que produciría en un sinnúmero de conceptos o aspectos jurídicos que giran alrededor de la fami-lia y que no han sido contemplados en este recurso. Alegato de la Procuradora General, pág. 26.
Dos párrafos de alegaciones generalizadas no son sufi-cientes para cumplir con la carga de probar que la clasifi-cación inherentemente sospechosa establecida por el Art. 138 del Código Civil, supra, persigue un interés apre-miante y que el trato desigual cuestionado es el medio ne-cesario y menos oneroso para conseguirlo. El único interés que el Estado señala es proteger los valores que emanan de la institución de la familia, establecida en el Código Civil de 1932, compuesta por padre, madre e hijos. Sin embargo, el Estado no especifica por qué tener dos madres o dos padres legalmente reconocidos atenta contra los valores a los que se refiere. Tampoco explica cómo prohibir, este tipo de adopción es el medio necesario y menos oneroso para conseguir su alegado interés, ni cómo ello promueve el me-jor bienestar de menores como JMAV. Incluso, cabe pre-guntarnos, si la única forma como el Estado puede encau-sar su alegado interés “legítimo” es prohibiendo este tipo de adopción, ¿cómo se justifica que una persona pueda adoptar individualmente a otra, independientemente de que tenga una relación de concubinato ya sea heterosexual u homosexual? Es más, ¿cómo se justifica prohibirle a dos personas del mismo sexo, que no tienen una relación de pareja, ser los padres o madres legales de otra persona? Por ejemplo, ¿qué interés tendría el Estado para prohibir que una mujer adopte a la hija de su hermana, es decir, a su sobrina, cuando esta provenga de una única filiación sin que la adopción conlleve la ruptura de vínculo alguno? ¿Cómo se justifica que exista la posibilidad de que la misma mujer adopte a la hija de su hermano, sin que este pierda su vínculo jurídico con la menor?
Evidentemente, la clasificación inherentemente sospe-chosa establecida por el Art. 138 del Código Civil, supra, no *987 sobrevive el análisis constitucional bajo el escrutinio estricto. Por ende, es ineludible decretar su inconstitu-cionalidad.(12)
Tras concluir que es inválida la prohibición establecida en ese artículo, debo determinar si procede conceder a AAR la adopción de la menor JMAV sin que ello conlleve la rup-tura del vínculo jurídico de la menor con su madre legal, CVY. En vista de que la clasificación sospechosa incluida en el Art. 138, supra, es inconstitucional, esta determina-ción debe realizarse aplicando el resto de nuestro estatuto de adopción.
y
Para ello, hay que determinar en primer lugar si AAR cumple con los requisitos para ser adoptante. En lo perti-nente, el Art. 130 del Código Civil, 31 L.P.R.A. sec. 531, requiere que el adoptante sea mayor de edad, tenga capa-cidad jurídica para actuar y tenga por lo menos catorce años más que el adoptado menor de edad. De otro lado, el Art. 131 del Código Civil, 31 L.P.R.A. sec. 531, dispone que no podrán ser adoptantes las personas declaradas incapa-ces por decreto judicial ni las que estén cumpliendo una pena de reclusión. Estos requisitos deben interpretarse li-beralmente a favor del adoptado. Feliciano Suárez, Ex *988 parte, 117 D.P.R. 402, 414 (1986).(13) Asimismo, ya señala-mos que el principio rector de la adopción es el mejor bien-estar del menor. López v. E.L.A., supra; Zapata et al. v. Zapata et al., supra.
No hay duda de que AAR cumple con los requisitos es-tablecidos en el Art. 130 del Código Civil, supra, para ser adoptante y no le aplican las prohibiciones del Art. 131 del mismo cuerpo legal, supra. AAR es mayor de edad, tiene capacidad jurídica para actuar y supera el requisito de te-ner por lo menos catorce años más que JMAV. De otro lado, AAR no ha sido declarada incapaz por decreto judicial y nunca ha sido sentenciada a cumplir pena de reclusión.
El único obstáculo que se podía argumentar en contra de la adopción solicitada es el hecho de que AAR es del mismo sexo que CW. Sin embargo, ya concluimos que esa prohibición es inconstitucional por ser discriminatoria y violar la cláusula de igual protección de las leyes. Además, este hecho es irrelevante para JMAV, quien afirma orgu-llosa: “y° tengo dos mamás”. Alegato de la peticionaria, pág. 3.
Respecto al mejor bieñestar de JMAV, amerita destacar la prueba pericial no refutada que obra en autos. Recorde-mos que nos corresponde hacer nuestra determinación ba-sándonos en el expediente del caso.(14) Las peticionarias lograron demostrar a cabalidad que el nacimiento de *989 JMAV fue bien planificado, que siempre ha existido un nú-cleo familiar entre las dos madres y JMAV, que la menor *990 tiene vínculos de apego muy estrechos con AAR y que tanto AAR como CW poseen capacidades protectoras, cognosci-tivas y emocionales ideales para garantizar el desarrollo pleno y saludable de la menor. Además, la prueba pericial demostró que JMAV goza de estabilidad psicológica, que tiene un aprovechamiento académico sobresaliente y que se relaciona muy bien con niños de su edad. Asimismo, se probó que ambas madres participan activa y equitativa-mente en la crianza, el desarrollo y aprendizaje de la menor. Por eso, tanto la Dra. Carol M. Romey, psicóloga clínica y forense, como la Dra. Carmen D. Sánchez, traba-jadora social, concluyeron que legalizar el núcleo familiar existente entre CW, AAR y JMAV brindará un mayor bienestar social, económico y emocional a la menor. Siendo así, es preciso reconocer que la realidad fáctica del núcleo familiar ante nos supera por mucho el análisis requerido para determinar que la adopción de JMAV por parte de AAR redundará en el mejor interés de la menor. Como bien señala el compañero Juez Asociado Señor Estrella Martí-nez, el propio Procurador General reconoció que:
... la prueba vertida en el récord de este caso no indica que [la] menor sufriría daño de concederse lo que se solicita; todo lo *991 contrario, como asunto fáctico, la prueba demuestra que los intereses de [la] menor muy posiblemente serían servidos si se concediese el remedio solicitado por la parte apelante, ya que toda su vida ha conocido a la apelante como, en efecto, su segunda madre. No se trata de quitarle patria potestad a un padre, pues no lo hay, sino de añadirle una segunda madre a una menor que en este momento tienen solamente un adulto con patria potestad sobre ella. Apéndice, pág. 341.
Inversamente, no permitir la adopción solicitada pon-dría a JMAV en desventaja, dado que solo CW sería reco-nocida legalmente como madre mientras que AAR sería una extraña en términos legales, a pesar de ser su madre de facto desde su nacimiento. S. Bryant, Second Parent Adoption: A Model Brief, 2 Duke J. Gender L. & Pol’y 233, 234 (1995). Véase además, H.A. Meléndez Juarbe, Privacy in Puerto Rico and the Madman’s Plight: Decisions, 9 Geo. J. Gender & 1. 1, 110-111 (2008). Impedir que AAR adopte a JMAV sin que esta pierda su vínculo jurídico con CW significaría que probablemente la menor no sea elegible para el plan médico, seguro de vida o beneficios por inca-pacidad de AAR; que no pueda heredar de AAR si esta fallece intestada; que AAR no pueda consentir a los proce-dimientos necesarios en caso de que JMAV enfrente una emergencia médica; que si CW y AAR se separan, la rela-ción entre JMAV y AAR quedaría completamente desprote-gida, es decir, AAR no podría solicitar relaciones filiales ni custodia y JMAV no tendría derecho a requerir alimentos a AAR, y que si CW falleciera, AAR podría perder la custo-dia de JMAV frente a un pariente biológico de esta. Véanse: J.S. Schacter, Constructing Families in a Democracy: Courts, Legislatures and Second-Parent Adoption, 75 Chi.-Kent L. Rev. 933, 936 (2000); Bryant, op. cit., 237-241. Véase, además, K.T. Barlett y D.L. Rhode, Gender Law and Policy, 5ta ed., Nueva York, Aspen Pub., 2010, págs. 343-348.
En síntesis, lo relevante para adjudicar la solicitud de adopción ante nuestra consideración no es el sexo de la *992 adoptante, sino que JMAV proviene de una única filiación, que AAR cumple con los requisitos para adoptar, que la adopción resultaría en el mejor bienestar de JMAV y que denegarla resultaría en un grave perjuicio para la menor. Partiendo de lo anterior, y teniendo presente nuestra obli-gación de velar por el mejor interés de los menores, conce-dería la adopción solicitada. Véanse: Estrella, Monge v. Figueroa Guerra, 170 D.P.R. 644 (2007); Rivera v. Morales, 167 D.P.R. 280 (2006). Solo así avanzaremos en nuestro camino hacia la igualdad que nuestra Ley Suprema garan-tiza a todos y todas. Recordemos que:
[e]l fin de la Constitución es la convivencia social con respeto y justicia para todos. Su vitalidad descansa en su dinamismo. Es un documento que rebasa las preferencias personales de sus autores y plasma las esperanzas de ulteriores generaciones. Su factura es moderna, de lenguaje claro y sen-cillo, susceptible a una continua renovación. No está escrito en lengua extinta, arduo de descifrar y referente a asuntos esotéricos. Interpretamos una Constitución, no los Rollos del Mar Muerto. Nuestra decisión no es incompatible con las ga-rantías que un Estado democrático debe a sus ciudadanos... En buena teoría de adjudicación, además, los parlamentos no son los únicos agentes de cambios sociales necesarios. Cuando se trata de mantener vivo un esquema constitucional, de con-servarlo en buena sintonía con las realidades del país, es principal deber de la judicatura propender igualmente a tal fin, aunque con la mesura y circunspección que le impone su papel dentro de nuestro sistema de gobierno y sin exceder al marco de sus atribuciones. P.R. Tel. Co. v. Martínez, 114 D.P.R. 328, 349-350 (1983).
VI
En resumen, concluyo que el Art. 138 del Código Civil, supra, prohíbe expresamente que una persona del mismo sexo adopte el hijo de su pareja, sin que esto conlleve la ruptura del vínculo jurídico entre el adoptado y su padre o madre legal. Ello nos impide acoger la figura de second parent adoption para conceder la adopción solicitada en este caso.
*993 Ahora bien, esta disposición contiene una clasificación inherentemente sospechosa que contraviene la prohibición constitucional contra el discrimen por razón de sexo. Esta protección constitucional se extiende al discrimen por orientación sexual por lo que procede aplicar el escrutinio estricto a esta clasificación. En este caso, el Estado no de-mostró que este trato desigual persigue un interés apre-miante y que la clasificación cuestionada es el medio nece-sario y menos oneroso para conseguirlo. Consecuente-mente, es forzoso concluir que la clasificación contenida en el artículo impugnado es inconstitucional por ser discrimi-natoria y violar la cláusula de igual protección de las leyes.
Tras descartar este impedimento inconstitucional a la adopción solicitada, es preciso reconocer que la peticiona-ria demostró que cumple con todos los requisitos para adoptar a quien ha sido su hija de facto por más de doce años y que la adopción redunda en el mejor bienestar de la menor. Por ende, concedería la adopción según solicitada.
Sin embargo, mientras el resto del mundo sigue abriendo las puertas a los reclamos legítimos de seres hu-manos discriminados por su orientación sexual, una mayo-ría de este Tribunal se rehúsa a decretar la inconstitucio-nalidad del artículo cuestionado mediante una interpretación restrictiva de nuestra Carta de Derechos. La intención de nuestros Constituyentes fue crear una Constitución de avanzada; no un pergamino arcaico con-servado en un monasterio de monjes cartujos que justifi-que el insularismo judicial al cual hoy nos lleva la opinión mayoritaria. Disiento.
— O —

 Como discutiré más adelante, debe entenderse que la prohibición constitu-cional contra el disciernen por razón de sexo incluye el discrimen por razón de género, dado el desarrollo histórico del concepto.

 Tan reciente como ayer, el Tribunal Constitucional de Alemania y el Tribunal Europeo de Derechos Humanos de Estrasburgo emitieron sendas sentencias para permitir que las personas del mismo sexo que formen parte de una unión civil pue-dan adoptar a los hijos adoptados por su pareja, fundamentándose en la igualdad ante la ley. Véanse: J. Gómez, La justicia europea da un espaldarazo a la adopción por parejas homosexuales, El País, http://sociedad.elpais.com/sociedad/2013/02/19/ actualidad/1361277263— 007800.html Véanse, además: http://www.bundesver fassungsgericht.de/en/press/bvg13-009.html; http://hudoc.echr.coe.int/sites/eng-press/pages/search.aspx?i= 003-4264492-5083115 (últimas visitas el 20 de febrero de 2013).

 En este caso, interpretamos el derogado Art. 133 del Código Civil, 31 L.P.R.A. ant. sec. 534 (ed. 1993), el cual disponía que: “[c]on [la] adopción cesarán todos los derechos, deberes y obligaciones del adoptado en su familia natural o biológica y los de ésta con el adoptado”.

 El profesor Strauss compara United States v. E.C. Knight Co., 156 U.S. 1, 10-18 (1895), y Carter v. Carter Coal Co., 298 U.S. 238, 309-310 (1936), con NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 36-37 (1937); Goesaert v. Cleary, 335 U.S. 464, 466-467 (1948), con United States v. Virginia, 518 U.S. 515, 543-544 y 556-558 (1996); Plessy v. Ferguson, 163 U.S. 537, 550-551 (1896), con Brown v. Board of Education of Topeka, 347 U.S. 483 (1954); así como Baker v. Carr, 369 U.S. 186, *973 208-210 (1962), y Reynolds v. Sims, 377 U.S. 533, 565-566 (1964), que revocó a Colegrove v. Green, 328 U.S. 549, 552-556 (1946).

 Griswold v. Connecticut, 381 U.S. 479 (1965), (el derecho a la privacidad, al matrimonio y al espacio protegido del cuarto matrimonial incluye el derecho al uso de contraceptivos); Eisenstadt v. Baird, 405 U.S. 438 (1972), (el derecho a la privacidad y la igual protección de las leyes protegen el derecho de las personas solteras a usar anticonceptivos); Roe v. Wade, 410 U.S. 113 (1973), (el derecho a la privacidad incluye el derecho al aborto); Carey v. Population Services Int’l, 431 U.S. 678 (1977), (el derecho a la privacidad incluye el derecho de menores de dieciséis años a usar anticonceptivos).

 Como puede apreciarse, la Sec. 19 de nuestra Constitución, L.P.R.A., Tomo 1, establece dos principios: (1) que la enumeración de derechos no se interpretará de forma restrictiva y (2) que esa enumeración no excluye otros derechos pertenecientes al pueblo. La Enmienda EX de la Constitución de Estados Unidos solo establece el segundo principio, al disponer que: “[n]o se interpretará la enumeración en la Cons-titución de ciertos derechos para negar o menospreciar otros derechos retenidos por el pueblo”, esta no contiene un lenguaje similar al expuesto en la Sec. 19 de nuestra Carta de Derechos a los efectos de que la enumeración hecha “no se entenderá en forma restrictiva”. Enmda. IX, Const. EE. UU., L.P.R.A., Tomo 1, ed. 2008, pág. 202. Véase Art. II, Sec. 9, Const. E.L.A., supra, pág. 379.

 Sobre este particular, el catedrático y exdecano de la Facultad de Derecho de la Universidad Interamericana de Puerto Rico, Carlos E. Ramos González, sostiene que:
“La noción contemporánea de la dignidad humana... es ahora inalienable en todos los seres humanos y existe en idéntica magnitud en cada uno de ellos. Es el imperativo fundamental contra la discriminación.
Este entendimiento moderno ha de culminar con la Declaración Americana de los Derechos y Deberes del Hombre en 1948 (en adelante Declaración Americana) y seis meses después, en la Declaración de los Derechos del Hombre”. (Enfasis suplido y en el original). C.E. Ramos González, La inviolabilidad de la dignidad humana: lo indigno de la búsqueda de expectativas razonables de intimidad en el derecho constitucional puertorriqueño, 45 Rev. Jur. U.I.P.R. 185, 186 (2011).

 Ex directora ejecutiva de la organización Gay & Lesbian Advocates & Defenders (GLAD) de Nueva Inglaterra.

 Interesantemente, el informe relata que “a esta misma conclusión llegaron por abrumadora mayoría, casi por unanimidad, los jueces y las juezas participantes en las sesiones de investigación participativa llevadas a cabo por la Comisión”. Informe, pág. 24 esc. 17.

 De hecho, bien podríamos concluir que el Art. 138, supra, establece una clasificación discriminatoria por razón de sexo, meramente fisiológico, al prohibir que una persona del mismo sexo al del padre o madre legal adopte al hijo de este último sin que ello conlleve la ruptura de vínculo jurídico alguno, independiente-mente de que exista o no una relación de pareja entre el adoptante y el padre o madre legal.

 De hecho, aplicando el escrutinio racional, que es mucho más laxo, el Tribunal Supremo de Estados Unidos ha declarado la inconstitucionalidad de leyes que infringen los derechos constitucionales de gays y lesbianas. En 1996, el Máximo Foro federal aplicó este escrutinio a una enmienda a la Constitución de Colorado que prohibía toda acción legislativa, ejecutiva o judicial dirigida a proteger a los homo-sexuales contra el discrimen. Véase Romer v. Evans, 517 U.S. 620 (1996). Encontró que la ley no tenía un nexo racional con algún interés gubernamental legítimo. Id. Así, determinó que esta enmienda era inválida por violar la cláusula de igual pro-tección de las leyes. Id. De igual forma, esa Alta Curia evaluó, mediante el escrutinio racional, la constitucionalidad de una ley de Texas que criminalizaba que dos adultos del mismo sexo incurrieran en conducta sexual, aunque mediara consentimiento entre ellos. Véase Lawrence v. Texas, 539 U.S. 558 (2003). Concluyó que el Estado no demostró interés legítimo alguno. Id. Así pues, declaró que la ley era inconstitucional porque infringía el derecho a la libertad protegido por la cláusula del debido proceso de ley de la Decimocuarta Enmienda. Id.

 Nótese que, entre los requisitos para conceder una petición de adopción, no figura que exista una relación afectiva de pareja entre los adoptantes. Incluso, ac-tualmente, las personas que aspiran a ser padres o madres están recurriendo a acuerdos para compartir las obligaciones y los derechos que conllevan la crianza de un menor, sin que ello implique que exista una relación de pareja entre los progenitores. Véase A. Ellin, Making a Child, Minus the Couple, The New York Times, 8 de febrero de 2013, disponible en: http://www.nytimes.com/2013/02/10/ fashion/seeking-to-reproduce-without-a-romantic-partnership.html?pagewanted= all&_r=0 (última visita el 15 de febrero de 2013).

 Con el mayor respeto a su posición sobre la ley que origina el caso de autos, el compañero Juez Asociado Señor Kolthoff Caraballo, por el contrario, recurre a prueba exógena de que las partes no tuvieron oportunidad de refutar ni el tribunal de aquilatar su valor probatorio. Así pues, en su discusión sobre el rol de los tribu-nales de asegurar el mejor bienestar del menor, expresa que:
*989 "... los tribunales estamos obligados a prever, utilizando los mejores recursos disponibles, cuál ha de ser el desarrollo de ese menor ante los distintos factores pre-sentes y futuros a los que ha de enfrentarse, incluyendo, según mi criterio, factores sociológicos y culturales. Es por eso, que entiendo importante reseñar un reciente estudio que provee datos científicos en torno a lo que ha sido el desarrollo de perso-nas hoy adultas, pero que fueron adoptadas o criadas por parejas del mismo sexo, en Estados Unidos.” (Enfasis en el original). Opinión de conformidad del Juez Asociado Señor Kolthoff Caraballo, pág. 922.
Basado en esto, detalla un estudio realizado por el Dr. Mark Regnerus, profesor asociado de Sociología de la Universidad de Texas. En este, según el compañero Juez Asociado Señor Kolthoff Caraballo, se demostró que los menores criados en hogares compuestos por parejas gais y lesbianas reflejan resultados inferiores a las variables estudiadas en comparación con las personas criadas en hogares compuestos por pa-rejas heterosexuales.
El compañero Juez Asociado Señor Kolthoff Caraballo no le da suficiente peso al hecho de que este estudio ha sido objeto de amplio debate y su validez ha sido muy cuestionada por la comunidad científica, entre otras razones, por la metodología investigativa que utilizó y por estar matizado por criterios religiosos. De hecho, ante el intenso debate que generó la publicación de sus hallazgos, se le preguntó en una entrevista al doctor Regnerus qué, si algo, hubiera hecho diferente durante la con-ducción del estudio. Este expresó: “I’d be more careful about the language I used to describe people whose parents had same-sex relationships. I said ‘lesbian mothers’ and ‘gay fathers,’ when in fact, I don’t know about their sexual orientation”. (Enfasis suplido). Durante la entrevista, también admitió lo siguiente: “I take pains in the study to say this is not about saying gay or lesbian parents are inherently bad. It is not a study about parenting or parenthood, or parenting practices. I didn’t measure parenting practices”. K. Dial, Friday 5: Mark Regnerus, 16 de octubre de 2012, disponible en: http://www.citizenlink.com/2012/10/26/friday-5-mark-regnerus/. Véase además, Z. Ford, Mark Regnerus Admits His ‘Family Structures’ Study Wasn’t About Gay Parenting, Think Progress LGBT, 30 de octubre de 2012, disponible en: http:// thinkprogress.org/lgbt/2012/10/30/1110591/regnerus-admits-gay- parenting/; M. Oppenheimer, Sociologist’s Paper Raises Questions on Role of Faith in Scholarship. New York Times, 12 de octubre de 2012, disponible en: http://www.nytimes.com/2012/10/ 13/us/mark-regnerus-and-the-role-of-faith- in-academics.html; C. Wetzstein, Gay parenting studies disputed by association, Standing by earlier research. The Washington Times, 13 de junio de 2012, disponible en: http://www.washingtontimes.com/ news/2012/jun/13/gay-parenting-studies-disputed-by-association/ (últimas visitas el 14 de febrero de 2013).
Ante esta realidad, el compañero Juez Asociado Señor Kolthoff Caraballo ex-presa que este estudio no debe considerarse en la evaluación del caso ante nos, precisamente porque “no fue parte de la prueba presentada en el caso de autos”. Opinión de conformidad del Juez Asociado Señor Kolthoff Caraballo, págs. 926-927. No obstante, poco después afirma que:
“... al igual que la controversia en el caso de autos nos muestra una realidad fáctica de nuestra sociedad, el estudio del doctor Regnerus nos muestra otra realidad que el Estado, en su deber de parens patriae y dentro del marco del ‘mejor bienestar del menor’ debe considerar al momento-de evaluar todo lo relacionado con la adop-ción por parte de parejas del mismo sexo, indagando c¡ué factores produjeron los resultados de este revelador estudio”. (Enfasis suplido). Id., pág. 928.
Por otra parte, aunque la prueba que obra en el expediente es suficiente para *990 llevar a cabo un análisis ponderado y objetivo sobre si conceder la petición de adop-ción resulta en el mejor bienestar de JMAV, es menester señalar la existencia de estudios que sí obran en el expediente y que fueron admitidos como prueba científica. Véanse: T. Krupat, Taking the Village Seriously: The Implications of the Importance of Attachment, Continuity and Expanded Family Networks for Children and Families in the Child Welfare System, 206 PLI/CRIM 79 (2006); S.A. Riggs, Is the Approximation Rule in the Child’s Best Interest? A Critique from the Perspective of Attachment Theory, 34 Fam. Ct. Rev. 481-482 (2005); S. Golombok, B. Perry, A. Burston, C. Murray et al., Children with Lesbian Parents: A Community Study, 39 (Núm. 1) Dev. Pyschology, 20-33 (2003); E.C. Perrin, Technical Report: Coparent or Second-Parent Adoption by Same-Sex Parents, 109 (Núm. 2) Pediatrics 341 (2002); S. Golombok & F. Tasker, Do parents Influence the Sexual Orientation of Their Children? Findings from a Longitudinal Study of Lesbian Families, 32 (Núm. 1) Dev. Psychology, 3-11 (1996); F. Tasker y S. Golombok, Adults Raised as Children in Lesbian Families, 65 (Núm. 2) Am. J. Orthopsychiatry 203-215 (1995); M.A. Gold, E.C. Perrin, D. Futterman y S.B. Friedman, Children of Gay or Lesbian Parents, 15 (Núm. 9) Pedriatrics Rev. 354-358 (1994); J. Bowbly, A Secure Base: Parent-Child Attachment and Healthy Human Development, Nueva York, Ed. Basic Books, 1988; R. Green, Sexual Identity of 37 Children Raised by Homosexual or Transexual Parents, 135 (Núm. 6) Am. J. Psychiatry 692 (1978).

 Los hechos del caso y los resultados de las evaluaciones periciales están detallados en la Opinión disidente del Juez Asociado Señor Estrella Martínez, págs. 1071-1076 y 1094-1097. Véanse también los recuentos de los hechos procesales en la Opinión de la Jueza Asociada Señora Pabón Charneco, págs. 845-848, y en la Opinión disidente de la Juez Asociada Señora Rodríguez Rodríguez, págs. 1003-1009.